[Crim. No. 1799. Second Appellate District, Division Two.—March 31, 1930.]

THE PEOPLE, Respondent, v. A. I. LASKER, Appellant.

(1)

Dudley Robinson and C. Morton Booth for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

WORKS, P. J. — Defendant was convicted, upon five counts, of making false entries in the books of Lasker Finance Corporation. This crime is denounced by section 563 of the Penal Code. Defendant appeals from the judgment of conviction and from the order of the trial court denying his motion for a new trial.

■ Appellant contends that the evidence was insufficient to support the verdict returned against him under the first count of the indictment. It was charged in this count that appellant was a director and the president of the Lasker Finance Corporation, and that as such, with intent to defraud the corporation of a certain sum, he did make and concur in making, on a certain date, a false entry in its books, thus:

"Furniture and fixtures........ ....$ 46,462.79
Insurance Agency plant............$175,000.00"

It was further alleged that these items meant and were intended to mean that when they were entered the sum of $46,462.79 of the money of the corporation had been invested in furniture and fixtures and that $175,000 of its assets was represented in insurance agency plant. Then followed allegations, in appropriate form, that the items were false and that appellant knew they were false.

Appellant contends that the evidence was insufficient for the reason that no testimony was adduced to show the value of the corporation's furniture and fixtures and insurance agency plant. Respondent admits that there is no direct evidence of the value of these assets, but insists that certain features of the evidence show that the two items were excessive and that appellant was aware of that fact. The Lasker Finance Corporation was organized for the purpose of taking over the properties of the A. I. Lasker Corporation, of which older institution appellant was the president as well as of the newer one. These two organizations will henceforth be referred to, respectively, as Finance and A. I. L. It became necessary for Finance to procure from the corporation commissioner a permit to issue to the stockholders of A. I. L. the shares of stock which, by the arrangement between the two corporations, were to go to them

for the purpose of consummating the contemplated swallowing up of A. I. L. by Finance. The item "furniture and fixtures" was carried on the books of A. I. L. at $16,187.39, while the item "insurance agency plant" was there shown at $75,000. According to the testimony of one Warshaw, auditor of A. I. L., he was by appellant called into the latter's office before Finance was incorporated and took with him certain of the books and papers of A. I. L. Appellant then told him that he was intending to "organize or reorganize the corporation" and to ask the corporation commissioner "for a new issue of stock." Appellant also said that he "had intended to increase the amount of furniture and fixtures, in the sum of $30,000.00 and to increase the amount of insurance agency plant to $175,000.00," and asked Warshaw what he thought of the idea. The auditor responded that he did not think it was proper to increase the item of furniture and fixtures, as "it was a fixed asset" and the books reflected the true cost of all the furniture and fixtures that "we had in the office," but that he saw no reason why the item of insurance agency plant should not be increased, "in so far as that being an intangible asset, . . . because who is going to determine whether our insurance agency plant is worth this much or that much?" but that "the thing that mattered most was that it would reflect an increase in the surplus account, in the statement that was going to the commissioner." To this appellant replied that he did not see why A. I. L. could not increase the value of both items "at that time." During the conversation Warshaw said to appellant, according to the former, "that in so far as the commissioner of corporations laid so much stress on earned surplus accounts that if they received this statement showing such a large increase in the earned surplus account that they may get the wrong idea as to what our actual surplus was." On the next day after this conversation Warshaw took to appellant, at the latter's request, a paper containing various matters, among them the items of furniture and fixtures and insurance agency plant as carried on the books of A. I. L. This paper was then left with appellant who returned it to Warshaw some three months later. It was by the latter destroyed. He testified that when appellant returned the paper to him the figures

opposite the item "furniture and fixtures" had been canceled in pencil and an amount $30,000 larger inserted in their place in pencil. The figures opposite the item insurance agency plant had been increased by $100,000 by the same method. Warshaw thus testified to what occurred when appellant handed him the paper containing these pencil corrections: "He [appellant] told me that the commissioner of corporations' office had refused to take the statement that they originally sent in with their application; that statement had been marked 'Appraised' and that the office of the commissioner wanted an actual financial statement of the corporation instead of an appraised statement. He told me to have the stenographer typewrite this statement he returned to me showing effect to the pencil corrections." The typewritten statement was prepared as requested by appellant and was by Warshaw returned to him. Later the commissioner issued his permit to Finance. Following this Warshaw was instructed to open the books of Finance. These books showed a journal entry reflecting a transfer from A. I. L. to Finance of the two items of assets here in question, in amounts as they appear in the first count of the indictment, and a posting of the amounts to appropriate accounts in the ledger. The items were entered in the journal at the direction of appellant.

It is this chain of evidence, with other evidence cumulative of it, upon which respondent relies as a support for the verdict of guilty under the first count, but before we may determine the contention of appellant that the evidence was insufficient it becomes necessary to state a chronology of events. The first conversation between appellant and Warshaw occurred after September 15, 1925, but before Finance was incorporated. The next day after this conversation Warshaw gave to appellant the paper containing, among other things, the items of furniture and fixtures and insurance agency plant as carried on the books of A. I. L. On or about September 25, 1925, Finance was incorporated. In December, 1925, appellant returned to Warshaw the paper the latter had given him, but with the pencil changes concerning which Warshaw testified. The first count of the indictment charges that the two items specified in it were entered in the books of Finance on March 1, 1926. The

items, as shown by the journal and ledger of Finance, bear that date.

We think the evidence justified the jury in drawing the inference that the increase on the books of the amount representing furniture and fixtures in the sum of $30,000 was fictitious, without testimony fixing a definite value for the furniture and fixtures. Warshaw testified that he said to appellant, during their first conversation, that the item of $16,000, in round numbers, in the books of A. I. L., represented the true value of the personalty in question. The conversation as detailed by him shows no challenge by appellant of the truth of this statement, a challenge which must surely have come from him if the increase he proposed was about to be made for the reason that the books of A. I. L. showed a figure of $30,000 less than the real value of the furniture and fixtures. The jury had the right to take appellant's silence here exhibited as a circumstance proving that the increase was made for the purpose of showing on the books an inflated and excessive value for the furniture and fixtures. We doubt whether, in the particular now under discussion, the evidence was sufficient to justify a verdict of guilt as to the increase of the amount opposite the item "insurance agency plant" from $75,000 to $175,000, but it is unnecessary for us so to determine. Both that item and "furniture and fixtures" are included as a single false "entry" in the first count of the indictment, and proof that either of them was false suffices to uphold the verdict on that count.

The next point made by appellant is that the verdict under the first count is not supported by the evidence, for the reason that no intent to defraud was shown by the entry of the two items in the books of Finance. It is said that the harm was done, if any harm there was, by the alterations made in the books of A. I. L. With this contention we cannot agree. The jury could have determined very justly, from the evidence of the prosecution, that the deception sought to have been practiced by appellant would have been incomplete, wholly futile, in truth, but for the entry in the books of Finance. If those books had not agreed, in the matter of the items in question, with the entry in the books of the A. I. L., that which the jury had the right to infer it was the purpose of appellant to conceal

would at once have stood revealed. At least if the books of Finance had spoken truth those of A. I. L. must have been viewed with suspicion, even by the casual observer, with an immediate investigation as the necessary result. We think the evidence clearly established the fact that an improper showing upon both sets of books was necessary to even a temporary and apparent success in appellant's effort to defraud, and that under it the jury properly concluded that appellant had committed a crime in causing the two items to be entered in the accounts of Finance.

■ At the trial appellant moved to strike out certain exhibits mentioned in the testimony of Warshaw, as above detailed, and showing the manner in which the accounts of A. I. L. were tampered with in the matter of the two raised items above mentioned by us. The motion was denied and the ruling is assigned as error. We think it was not. The papers fitted nicely with the testimony of Warshaw to the effect that the value of the furniture and fixtures was properly shown on the books of A. I. L., before the items relating thereto were altered, and they were a necessary part of the entire story as to the general scheme to defraud to which we have already referred. In brief, they were necessary to a showing that the items as entered in the books of Finance were false. The entry in those books was false because it was but a repetition of items in the books of A. I. L. which some of the evidence clearly showed were false.

■ The record shows the following, during the cross-examination of the witness Warshaw by appellant's counsel: "Q. . . . Was there any profit from the embezzlement and confiscation in that insurance agency plant? A. There is a profit on embezzlement and confiscation, but that has nothing to do with the insurance agency plant. Q. Wasn't that carried as a part of the insurance agency plant? A. No, sir, that arises in a different way. It has nothing to do with our agencies, if I may answer that way." Warshaw also answered a moment later that the profit shown by the embezzlement and confiscation account of A. I. L., to which he referred in the part of the record just quoted, related to insurance, but that it had "nothing to do with any agencies that we had." The counsel then asked several other questions, designed to show what the embezzlement and

confiscation account "related to," how the items of the account "were carried," and other interrogations of a similar nature. Objection to all these questions was made on the ground that they were immaterial, and the objections were sustained. In making the rulings the trial judge remarked that the questions would not be proper unless it were first made to appear that any profits shown by the embezzlement and confiscation account came from the insurance agency plant of the company, and that it made no difference what earnings were shown by the account unless it appeared that they came from the agency plant. Further, he observed that the desired cross-examination would be allowed whenever the missing proof was supplied. In view of the answers of Warshaw to the effect that the profit shown by the embezzlement and confiscation account had "nothing to do with the insurance agency plant," that it was not "carried as a part of the insurance agency plant" and that it had nothing to do with any agencies, we think the rulings of the court were correct. Warshaw was a witness early in the trial, and at the time he took the stand there was nothing in the record to controvert his assertion that the profits in question had nothing to do with the insurance agency plant. Appellant says: "The court erroneously took the position that when an adverse witness has given a categorical answer, that that terminates the right to cross-examine further." Appellant, of course, could have cross-examined Warshaw without stint in a reasonable endeavor to shake his statement that the profits referred to bore no relation to the insurance agency plant, but that is far from saying that he could conduct the cross-examination upon which he sought to embark. It seems patent that if a witness swears that he was not present at the happening of a certain event, and there is nothing elsewhere in the record to show that he was present, it would be improper to allow the cross-examiner to ask him what occurred on the alleged occasion. The imagined situation is somewhat different from the one before us, but it is enough like it to furnish an example at which to point. We think that *People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129], and *People* v. *Baldwin,* 117 Cal. 244 [49 Pac. 186], cited by appellant, have no bearing upon the question here presented.

Appellant argues that the evidence was insufficient to support the verdict under the second, third, fourth and fifth counts of the indictment, thus presenting a question of some complexity. The false entries charged in these counts are related to or interwoven with each other. The items referred to in the second count are these:

"Credit Gallos Note.............................$3,000.
 Charge W. H. Kemble Account.................. 3,000."

Those pleaded in the third count are:

"Credit W. H. Kemble..........................$3,000.
 Charge Pacific Service Corporation.............. 3,000."

The fourth count relates to this item:

"Accounts Receivable, Commercial Credit.........$3,300."

These two items are specified in the fifth count:

"Charge Bond Account..........................$3,300.
 Credit Commercial Credit of California.......... 3,300."

Not only does appellant insist that the prosecution introduced no evidence that these various items were false, but he contends vigorously that the evidence affirmatively shows that they represent actual transactions of Finance. It is well settled that items in books of account cannot be termed false if they are a history of actual events, no matter what may be the nature of those events (*Coffin* v. *United States*, 156 U. S. 432 [39 L. Ed. 481, 15 Sup. Ct. Rep. 394, see, also, Rose's U. S. Notes]; *Twining* v. *United States*, 141 Fed. 41 [72 C. C. A. 529]). It therefore becomes necessary for us to scan the evidence in an endeavor to ascertain whether the entries here complained of truthfully represent actual transactions, and the labor is one of some magnitude.

The first item mentioned in the second count of the indictment relates to one Gallos, although the name is spelled Gollos in the transcript of the testimony. This individual—and all the witnesses to whom we shall refer in discussing this point, were called by the prosecution—testified that he called on one Kemble concerning a loan of $47,500, which he was desirous of procuring. Kemble introduced him to appellant and the two told Gollos that he might have the loan if he could procure a concern called the Blue Diamond Company as an indorser on the promissory note he was to give as evidence of it. On the next day he returned with

the note, indorsed as requested. He saw Kemble and appellant and they told him he could have the loan if he would discount the note to the extent of $3,000 and would buy $20,000 worth of stock. This proposition being acceptable to Gollos, appellant gave him a check of Finance for $47,500, and Gollos, Kemble and a representative of the Blue Diamond Company took it to a bank for deposit. The bank, however, would not receive it and asked for a cashier's check. The check was left with the institution and the party returned to appellant, who promised Gollos that he should have a cashier's check the next day. This promise was kept and the cashier's check was forthwith lodged with the bank for deposit, the institution returning the check of Finance first tendered to it. Gollos then handed to Kemble a cashier's check for $2,500 and his promissory note for $500. Gollos testified that these two items of paper were to cover "this bonus," evidently referring to what is above called a discount on the loan for which he had asked. He also testified that he signed a contract for the purchase of $20,000 worth of the stock which he was to buy, at the suggestion of appellant, as a condition for the making of the loan to him. Some time later, according to Gollos, he again saw appellant and Kemble, at the request of the latter, and appellant told him that the Blue Diamond Company had claimed that the payment of the $2,500 as a bonus was a usurious transaction, and asked if Gollos were willing to have the amount applied upon the "$20,000 purchase of stock," to which proposition Gollos assented. Gollos also said that after this understanding he issued to appellant a trust deed for $25,000 "for the" contract, by which he had agreed to purchase $20,000 worth of stock. He testified also that because of the attitude said to have been assumed by the Blue Diamond Company appellant was to give him a credit of $3,000, that as far as he knew he was allowed that credit on the books of Finance, and that he was told by Kemble and appellant that the credit had been given him.

Kemble took the witness stand immediately after Gollos had left it. He testified that the latter had come to him for the purpose of discounting a note signed by the Blue Diamond Company and indorsed by Gollos, and not for the

purpose of borrowing money; that Gollos neither applied for nor received a loan of money from appellant; that the note was discounted by the Discount Corporation of California; that Finance indorsed the paper below the indorsement of Gollos, whereupon the Discount Corporation issued its check, payable to Finance, for $47,500, and Finance made its check in the same amount, payable to the Blue Diamond Company; that this check was then taken to a bank which held some escrow in which Gollos was interested, but the bank declined to receive it, asking for a cashier's check in the same amount, and that Finance later supplied it; that the bank required the cashier's check because Gollos was immediately to receive some money out of the escrow and the bank would not pay against any check other than a cashier's check; that when "this check" (the record does not show which) was taken to the bank the party which went there consisted of Kemble, Gollos and a representative of the Blue Diamond Company; that before Gollos received his money from the bank there was a conversation in appellant's office to the effect that Gollos was to buy a certain number of shares of the stock of Finance; that "inasmuch as the transaction was between Mr. Gollos and the Lasker Finance Company and the Discount Corporation of California, and that the discount paid by Mr. Gollos was to go in its entirety to the Discount Corporation of California, there was no consideration for the handling of that note, so it was suggested to Mr. Gollos that if he would purchase $20,000 worth of stock in the Lasker Finance Corporation he would endeavor to have this note discounted by another finance company, which Mr. Gollos agreed to do, but stated that the only way that we could pay for it was by issuing his note in the amount of $20,000 and to pay the note out of funds which he had coming to him within the next 30 or 60 or 90 days, I forget just the time"; that Gollos then agreed to purchase the $20,000 worth of stock, the stock to be delivered when Gollos paid his note for that amount; that Gollos gave Kemble a check for $2,500, which the latter delivered to the Discount Corporation; that Kemble was not present when Gollos gave any note for $500, but that appellant told Kemble, after the giving of the $2,500 check, that he had given Gollos a credit of $3,000 on the note executed for the purpose of buying the stock, saying the credit was

given because "there was some talk about usurious interest charge in connection with the note," and that an objection to that effect was made by the Blue Diamond Company in the form of a refusal to pay the Discount Corporation; that he, Kemble, never authorized appellant to charge his account with $3,000 and give credit to Gollos for that amount, but that appellant "told me that he was going to hold my commission in the transaction for the $3,000" and that he never got any commission; that it first came to his attention five or six months after the discounting of "this note" that his account on Finance's books was charged $3,000 and that he then made objection to the charge to appellant; that thereupon appellant said that he had arranged to credit Kemble's account $3,000, and that he, Kemble, understood that this credit had been entered. The record also shows the following while Kemble was on the witness stand: "[Q.] I will ask you to state what you said to Mr. Lasker when you first approached him on the subject of charging your account $3,000? . . . A. I asked Mr. Lasker why he had charged my account with $3,000. . . . He stated that there was some claim made in connection with a usury charge and that he had charged my account $3,000, and credited Mr. Gollos' account on his note $3,000. Q. Did he say anything about the Discount Corporation, to whom you paid the $2,500? A. I don't recall that he did." The witness was then shown a statement which he had made to the district attorney, after which the record shows: "[Q.] Now, . . . does that refresh your recollection as to what he wished to show by your charge of $3,000? A. Yes, sir. Q. State what it was? A. $2,500 was the discount paid to the Discount Corporation of California; $500 was a note given by Gollos to me, I believe it was—I am not sure of that— which the Discount Corporation also was to get that note of $500, which they turned back to me in lieu of a commission on the transaction. So the $2,500 and the $500 made up the $3,000 which was ultimately charged to my account." Kemble further testified that he indorsed the $500 note, turned it over to appellant, and "told him at that time that the broker who brought Mr. Gollos into the office . . . was due a commission on the transaction, and that I had been given the note to take care of those things, and turned the note over to Mr. Lasker," that appellant insisted upon

having the note and that he reminded appellant three or four times about his being charged with $3,000 on the books of Finance. "[Q.] What did he say to you the second time that you reminded him of that fact, that you wished to be credited or have the books straightened out in regard to your account? A. He said it would be done. Q. Well, it wasn't done, was it? A. Well, I don't know just when it was done. I understand it has been done." Kemble also testified that he again called appellant's attention to the matter some days afterward, and appellant said, "I would get credit for the $3,000." Turning to another matter, he testified, in response to a question as to how he came to meet Gollos: "I believe Mr. Lanfield came into the office, and Mr. Lasker introduced me to Mr. Gollos through Mr. Lanfield"; that after his first interview with Gollos he "told Mr. Lasker that Mr. Gollos had a note of $47,500 which he wished to discount, and as he offered to discount it for $3,000, and Mr. Lasker instructed me to say to Mr. Gollos that we couldn't handle it ourselves as a company, but we would endeavor to have it discounted elsewhere"; that later appellant told him that if Gollos would purchase $20,000 worth of the stock of Finance "we would" arrange the discounting of the note; that, the Discount Company having required it, he, appellant, would guarantee the note; that appellant told him to convey this information to Gollos and that he did so. Kemble testified on recross-examination that he was to have a commission of $3,000 for the sale of the $20,000 worth of stock to Gollos, but that the commission was not payable until the stock was paid for and that it never was paid for.

The witness Warshaw testified that soon after the Gollos affair appellant told him "that he was afraid something would be started by the Blue Diamond Company regarding the Gollos original transaction due to usury and it would be best that something be done about it. The result of it was he told me to credit the Gollos contract, the Gollos note, with the amount of $3,000 and charge that amount to W. H. Kemble"; and that accordingly he, the witness, made out the journal entry to cover the matter and it was copied in the books by a bookkeeper. Some time later, according to Warshaw, he asked appellant whether Kemble "intended to pay this amount of money" and re-

spondent answered that he didn't think so, that "it would be charged off later" and that it was finally charged off "to an account called Commercial Credit of California"; that the concern so named "was a corporation that acted as a fiscal agency for" Finance; that there was no record of the amount ever having been paid, either by Kemble or by the corporation named; that the stock sold to Gollos was appellant's personal stock; that the note evidencing the sale was sold by appellant to Finance and that he received a credit of $20,500 for it. Warshaw also testified that as Gollos never paid for the stock he had purchased it was later sold to someone else and the amount that had been charged to Gollos was later charged off. Warshaw further testified: "When Mr. Lasker requested that Mr. Kemble's account be credited with $3,000 a charge had to be made somewhere for that amount and . . . it was made in a sum total of $10,000 to the Pacific Service Corporation bond account. . . . The $3,000 was included in this large charge of $10,000 . . . and the explanation is [on the books]: 'To charge the Pacific Service Corporation bond account with losses sustained by Commercial Credit of California and on W. H. Kemble' "; that appellant directed the entries to be made; that Pacific Service Corporation "is a corporation the entire issue of which was owned by" Finance, that the bond account of that corporation "was an account where we charged all interest charged on loans over and above 12 per cent interest," and "if we had losses on contracts we would ultimately charge it to" that bond account; that he believed there "was some sort of an agreement" between the Pacific Service Corporation and Finance whereby the former insured Finance "against loss on collection on its contracts"; that he had "seen the letter that was written in that regard"; that "this item was only one of a great number of items whereby the Pacific Service Corporation was charged by losses sustained by" Finance, and that wherever possible "all losses on all contracts" of Finance "were charged to the bond account" of the other corporation. Warshaw also testified without objection that there was no transaction between Kemble and appellant when the former was charged with $3,000 and none when he was given credit for that amount; that "it" was just a book entry. He testified further: "When the Pacific

Service Corporation was formed they made up a form of a bond, and every time we would make a loan, and let us say the interest was $25 and the charge was $50, we would take in $25 of the interest into our interest account and $25 we would credit to the Pacific Service Corporation bond account. In time, of course, there would be an accumulation of moneys there. And if we sustained a loss on automobiles'' Finance ''would charge the Pacific Service Corporation bond account.''

We have now concluded our examination of the more than 500 pages of the record to which appellant directs our attention in his presentation of the point that the evidence is insufficient to support the verdict under the second, third, fourth and fifth counts of the indictment. We have stated all the evidence directly bearing upon the question except items of it which are merely cumulative.

We are satisfied that the evidence was sufficient to support the verdict under the second count of the indictment. We need not tarry to state the conclusion we have tentatively reached—nor the views which seem to sustain it—as to the truth or falsity of the item showing a credit of $3,000 on the note of Gollos, for the reason that the testimony on that matter is complex and somewhat varied, and requires both time and space for its dissection. The necessity for the labor is obviated by the fact that there can be no dispute that the charge against Kemble in a like amount was utterly false. The entry was made upon the basis of no transaction whatever with him. This circumstance is ample to support the verdict, without reference to the status of the item showing the credit upon the Gollos note.

The question as to the sanctity of the verdict under the third, fourth and fifth counts requires no extended treatment, and those counts may be disposed of together. The items referred to in them were all entered for the purpose of clearing up and closing out the chimerical Kemble transaction. As that transaction had no existence the latter items were false entries. It may be, under the arrangement existing between Finance and Pacific Service Corporation and Commercial Credit of California, although we do not so decide, that in a sense there was a transaction behind those items. The books showed a charge against Kemble, whether just or unjust, and it was known that the

item would never be paid by him. If this state of affairs, *as a showing on the books,* allowed mere entries under the arrangement mentioned, as a matter of bookkeeping, appellant is not protected by the cases we have cited at the inception of the treatment of these questions. As to those later entries, that is, the ones made to clear away the illicit Kemble charge, the assertion of appellant that there was no evidence to prove that the items referred to in the second, third, fourth and fifth counts were false cannot be justified. The evidence shows, without dispute, whatever may appear merely upon the pages of the books cast up under the arrangement in question, that the items specified in the third, fourth and fifth counts were wholly false. Kemble never owed Finance $3,000. Therefore, he was not bound to pay it. Finance lost nothing when he did not pay it. There was, therefore, of course, no loss which could be charged successively against Pacific Service Corporation and Commercial Credit of California. After a reading of the evidence these points seem too clear for further argument.

Appellant assails certain instructions given by the trial judge to the jury. After the review of the evidence which we have presented these questions may be treated with brevity. ■ It is said, whether correctly or not we do not pause to consider, that some of the instructions assumed that the entries set forth in the indictment were false. If that be true the matter is of no moment, for the jury could not possibly have found that they were not false, nor that appellant was not aware of their falsity, nor that he did not participate in making them. Considering the discussion appearing in earlier portions of this opinion, it is unnecessary to mention other minor points made against the instructions. It is to be understood that in nothing we have said do we condemn the instructions as actually given by the judge.

One or two other points are made by appellant, but they do not appear to be of sufficient merit to require a specific consideration.

Judgment and order affirmed.

Craig, J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 12, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 28, 1930.